The Atchison, Topeka & Santa Fe Railway Company v. Frank S. Thomas, *doing business as M. A. Mead & Co.*

No. 13,787.   (78 Pac. 861.)

SYLLABUS BY THE COURT.

1. DAMAGES—*Direct and Proximate.*   Damages recoverable upon breach of a contract are only those that are the direct and proximate result of the wrongful act of which complaint is made.

2. ———— *Speculative, Remote, and Contingent.*   Damages that are speculative, remote or contingent cannot form the basis of a recovery for the breach of a contract.

3. ———— *Certain, Natural, and Proximate.*   Damages for anticipated profits recoverable upon breach of a contract must be established with a reasonable degree of certainty, must be the natural and proximate consequence of the breach, and be free from conjecture and speculation.

4. ———— *Damages Held too Remote and Contingent.*   In consideration of money advanced to inaugurate and establish a time-service system for a railway company, T. was orally given the right by the company to sell to its employees required to carry watches of a certain fixed standard 4800 watches of a certain model, bearing a copyrighted trade-mark and meeting a certain standard; and the company agreed to protect upon its books, and collect for T. from the personal earnings of the employees, while in its employ, their orders on the treasurer of the company, payable in monthly instalments of five dollars each, but no assurance was given to T. that the employees would pur-

chase watches of him. They were privileged to buy and carry any watch which would meet the required standard of the time service. The company thereafter refused longer to protect upon its books and collect such orders for T., but not until T. had sold to employees all the watches he had on hand when such arrangement was made. T. was under no legal obligation to purchase additional watches. *Held*, in an action by T. against the railway company to recover for a breach of contract, where the damages were for loss of profits on watches which T. claimed he might have sold to the employees, that his claim was too speculative, remote, and contingent.

Error from Jefferson district court ; MARSHALL GEPHART, judge. Opinion filed December 1, 1904. Reversed.

*Robert Dunlap*, and *A. A. Hurd*, for plaintiff in error.

*Ferry & Doran*, and *David Overmyer*, for defendant in error.

The opinion of the court was delivered by

ATKINSON, J.: This was an action by Frank S. Thomas, doing business under the firm name and style of M. A. Mead & Co., of Topeka, Kan., against the Atchison, Topeka & Santa Fe Railway Company, to recover $48,888, damages for the breach of a contract. Verdict and judgment were rendered for plaintiff in the sum of $20,000.

In June, 1896, Frank S. Thomas and one H. S. Montgomery, with whom he had for the purpose formed a copartnership, in the name of the latter entered into a contract with the Atchison, Topeka & Santa Fe Railway Company to inaugurate a uniform time service and establish a system of inspection of clocks used by defendant, and watches used by its employees, over its several lines of railroad. As a part of the contract with defendant, Montgomery, who was a practical watchmaker, was by defendant ap-

Railway Co. v. Thomas.

pointed its general watch and clock inspector, with a salary of $500 per annum. Thomas agreed, as a part of the contract, to finance the enterprise, pay Montgomery a salary of sixty dollars per month, and share equally the profits of the business with the latter. Defendant refused to appoint Montgomery its general watch and clock inspector until all his debts were paid, that it might not be annoyed by his creditors. Thereupon Thomas paid about $3000 of Montgomery's debts, to constitute him eligible for appointment. Thomas also agreed to superintend, and at his own expense, through Montgomery, rate, regulate and repair all clocks in use by defendant along its lines of railroad; and inspect, rate and regulate the watches of those employees of defendant who were required to carry watches to conform to the requirements of the time-service system. In consideration therefor defendant agreed, through its general manager, that Thomas and Montgomery, in the name of the latter, should have the right to supply and sell to the employees of defendant certain watches of a uniform character and of a standard to meet certain requirements. The contract received the aid and encouragement of the company. A circular was issued by the general manager defining the time service and its requirements. It announced that the employees in the operating department of the road would be required to carry watches to meet a certain standard. The circular also called the attention of the employees to the fact that, while any watch which would come up to the required standard would be sufficient, watches meeting the required standard could be purchased of Montgomery, as general watch and clock inspector, at reasonable prices and on monthly instalments. Thomas and Montgomery caused to be

constructed by the American Waltham Watch Company watches of a certain model and of a standard to meet the requirements of defendant, and caused to be placed thereon their trade-mark, the words, "Santa Fe Route," which trade-mark they had caused to be copyrighted in the name of Montgomery, who assigned to Thomas one-half interest therein. In the sale of these watches to the employees of defendant the note of the purchaser was taken, payable to the order of H. S. Montgomery, in monthly instalments of five dollars each.

This contract continued until July 1, 1897, a little more than one year, when it was terminated by the company without the consent of plaintiff. Its termination was effected by a circular issued by the president of the railway company. It was a general one prohibiting the employees of the company from engaging in private business, and the effect was to disqualify Montgomery, as general watch and clock inspector of the railway company, from further engaging in the sale of watches to the employees of defendant, unless expressly authorized by the president to do so. This disqualification of Montgomery had the effect to terminate the contract as to Thomas. It was claimed by Thomas that in the sale of watches to the employees of defendant he could only successfully operate through Montgomery, as he had been doing.

Soon after the issuing of this circular Thomas and Montgomery went from Topeka to Chicago to confer with President Ripley with reference to the effect of the circular on Montgomery, and on the business of selling watches to the employees. The president was firm in the position that Montgomery could not continue general watch and clock inspector of defendant

Railway Co. v. Thomas.

and at the same time engage in the sale of watches to employees. He declared that Montgomery must quit the sale of watches, or discontinue the duties of inspector. Thomas explained to President Ripley the contract between himself, Montgomery, and defendant, made through the general manager of the company; explained that he and Montgomery were partners in the enterprise; represented to the president that to apply the provisions of the circular to Montgomery, and thereby cause his discontinuance of the sale of watches to employees, or the discontinuance of the sale of watches to the employees through Montgomery, would be ruinous to the business; that he had financed the enterprise, and had expended large sums of money in inaugurating the time service for defendant; that there were a large number of watches of the special model and design which would be without a market and worthless; that he had on hand many instalment notes of the employees, taken in the name of Montgomery and given for the purchase of watches; that these notes would be difficult of collection from the employees; that the employees would pay the notes more readily when made payable, and apparently belonging, to Montgomery, an officer of the company, than if made or assigned to another; and that it would result in great financial loss and be ruinous to him.

The claim is made by Thomas that defendant, through President Ripley, admitted that it had been greatly benefited by the time service. The claim is also made that the president then stated that in consideration of the money advanced by Thomas in inaugurating the time service, and in compromise of the claim for the damage the latter would sustain from the termination of the contract, the company would reimburse him for the money he had expended in

inaugurating the time-service system; that he would give to Thomas the right to sell to the employees of defendant 4800 watches of the model bearing the "Santa Fe Route" trade-mark, with the privilege of taking from the employees orders on the treasurer authorizing the company to deduct five dollars per month from their earnings in payment for the watches purchased; that the company would, in so far as it was able to do so, collect these orders for plaintiff, and also undertake to collect from its employees, so far as possible, the instalment notes theretofore given in the name of Montgomery. The further claim is made by Thomas that he agreed to this proposition of settlement; and also that he undertook and agreed to sell to the employees of defendant 4800 watches of the model bearing the trade-mark.

Thomas, through Montgomery, accepted from defendant an amount in satisfaction of his claim for money advanced in installing the time-service system. The company collected from its employees, in so far as it was able to do so, the instalment notes given to Montgomery in payment for watches. Under the name of M. A. Mead & Co. Thomas entered upon the new arrangement with the company, through President Ripley, for the sale of watches, and sold 726 to the employees of defendant on the order system. The orders so taken were protected on the books of the company and collected for plaintiff from the personal earnings of the employees giving the orders. The sale of watches under this arrangement was discontinued on January 1, 1900, due to the company's refusing longer to accept and collect orders given by its employees. Plaintiff then brought this action, claiming damages to the amount of $48,888 — a loss of twelve dollars profit on each of the 4074 watches.

remaining unsold of the 4800 watches plaintiff claimed the right to sell under the arrangement.

The defendant company filed a general denial, but upon the trial of the case. interposed numerous defenses to plaintiff's claim. The trial resulted in a verdict and judgment for plaintiff in the sum of $20,-000.

Numerous errors are assigned by the railway company; among others, that the court erred in giving instruction No. 16, which was as follows :  •

"If you find from a preponderance of the evidence that the plaintiff is entitled to recover in this action, then his measure of damages would be the profits on the number of watches which he has shown by a preponderance of the evidence he could have sold and was prevented from selling to the employees of defendant company by reason of defendant refusing to protect such sales on the pay-roll of the company — not exceeding in amount the sum of $48,888."

It is the contention of defendant that plaintiff's claim for damages is too remote and contingent; that it is open to the charge of being prospective; and that it enters the domain of speculation. It is urged that, for the reasons assigned, plaintiff's claim for damages cannot constitute the basis for a valid judgment; that instruction No. 16, relative to the measure of plaintiff's claim for damages, was erroneous.

On January 1, 1900, when plaintiff's right to sell watches to the employees of defendant was terminated, he had sold all the watches of the design or model bearing the trade-mark which he had on hand at the time the arrangement was made with defendant giving to him the right to sell 4800 watches to the employees. Plaintiff was under no legal obligation to purchase watches of the model bearing the trade-mark to make up or complete the 4800 watches.

His claim for damages is based wholly upon the profits he claims he could have made—not upon watches owned by him, or upon watches which he was under a legal obligation to purchase, but upon watches that he could have purchased, and that he claims he could have sold to the employees of defendant at a profit of twelve dollars each, had his arrangement with defendant not been terminated. The only testimony upon the question of damages was that of plaintiff himself, who testified that he would have realized a profit of twelve dollars upon the sale of each of the remaining 4074 watches, could he have sold them to the employees under the arrangement he had with the company.

It is the aim and purpose of the law to give to a party injured by the breach of a contract all the damages which he may suffer from such breach ; and where the contract is made with a view to future profits, and such profits are within the contemplation of the parties, they may, where they can be established with certainty, form a just measure of damages. But the right to recover damages for anticipated profits has always been, and will continue to be, a troublesome question. No fixed rule can be laid down which, when applied to the facts of a case involving damages for anticipated profits, will determine whether a recovery may or may not be had. Each case must be determined upon the facts peculiar to itself. The authorities, both in the United States and England, are agreed as a general rule, subject to certain well-established qualifications, that anticipated profits prevented by the breach of a contract are not recoverable in the way of damages for such breach ; but in the application of this principle the same uniformity in the decisions does not exist. In

Railway Co. v. Thomas.

some cases of almost exact analogy in the facts the adjudications of the courts in the different states are directly opposite.

In *Gas Co. v. Glass Co.*, 56 Kan. 614, 44 Pac. 621, it was sought to recover damages for breach of a contract in which the gas company agreed to deliver at the works of the glass company for ten months all the natural gas necessary to run a twelve-pot glass factory for the manufacture of bottles. The main controversy in the case was over the allowance of prospective profits. It was contended by plaintiff that the net profits would have reached the sum of $10,000. In the opinion by Mr. Justice Johnston it was pointed out that the success of the venture did not depend merely upon the supply of fuel. The manufacture of glass in Kansas at that time was a new enterprise. It was subject to many contingencies. The material found had not yet been used for making glass, nor had a market been found for the product; it must be sold on a new market, and at a price in excess of the cost of production to yield a profit. This would involve the cost of proper advertising, the building up of a credit and reputation, the state of the glass trade, the competition that would have to be met, the rates of shipment, and the cost of the sale of the product. It was held that the question of profits was largely a matter of speculation and conjecture, and plaintiff was denied a recovery. This decision finds support in the following cases decided by this court: *States v. Durkin*, 65 Kan. 101, 68 Pac. 1091; *Investment Co. v. Burdick*, 58 id. 517, 50 Pac. 442; *Walrath v. Whittekind*, 26 id. 482; *M. K. & T. Rly. Co. v. City of Fort Scott*, 15 id. 435.

In *M. K. & T. Rly. Co. v. City of Fort Scott, supra*, it was sought by the city to recover damages for breach

27—70 KAN.

of a contract in which the railway company had agreed, in consideration that the city would issue to it $100,000 of the bonds of the city, to construct its lines of railroad through the city and locate therein its division headquarters, roundhouse, machine-shops, etc. Testimony was admitted tending to show a decline in the population of the city, and a depreciation generally in the value of real estate, after the construction of the road through the city and the location of the division headquarters, roundhouse and machine-shops elsewhere.    It was held that the claim of the city was too speculative, remote, and uncertain ; that in an action *ex contractu* only the direct and pecuniary loss of the city was the proper measure of damages.    It was held that there was no certain connection of cause and effect between a failure to build roundhouses and machine-shops and the decline of population or the decrease of values in real estate.    In the opinion by Mr. Justice Brewer many contingencies were referred to which might produce the results complained of but could not be traced to the act of the railway company.

Plaintiff, in support of his claim that the damages he recovered are not subject to the charge that they are too speculative, remote and contingent to constitute the basis for a recovery, directs our attention to the fact that this court recognized anticipated profits as the basis of a recovery in each of the following cases :  *Hoge v. Norton,* 22 Kan. 374 ;  *Osborne & Co. v. Stassen,* 25 id. 736 ;  *Brown v. Hadley,* 43 id. 267, 23 Pac. 492, and *Town Co. v. Lincoln,* 56 id. 145, 42 Pac. 706. These cases were cited for the same purpose in *Gas Co. v. Glass Co., supra.*    In distinguishing the cases cited from that case, and the reasoning applies equally well to the facts in the case at bar, it was said :

"Much reliance is placed upon the rulings of this

court in the cases of *Hoge v. Norton, supra; Brown v. Hadley, supra,* and *Town Co. v. Lincoln, supra.* All of these cases are close to the border line dividing profits which may be allowed from those which should be rejected. In each of them, however, the business upon which profits were allowed was not new or untried, but had been established and carried on to such an extent in the community that a safe basis of calculation could be found. In *Hoge v. Norton, supra,* profits were estimated on the cattle business, which is well established in Kansas, and is carried on to such an extent that the laws of feeding and growth are well understood, and the results reasonably certain. In *Brown v. Hadley, supra,* the business was dairying, which it was said has been extensively engaged in ever since the settlement of the state, and that therefore the gains could be estimated by men of experience in that business with reasonable certainty. In *Town Co. v. Lincoln, supra,* the breach of the contract resulted in breaking up an established business, and the profits that had been made for a reasonable period next preceding the time of the breach furnished a reasonably certain basis of calculating those that would have been realized if no breach had occurred." (Page 624.)

In *Central Coal & Coke Co. v. Hartman,* 111 Fed. 96, 49 C. C. A. 244, the only damages claimed in the petition, and the only losses which the plaintiff sought to prove at the trial, were the losses of some of the expected profits of his business of buying and selling coal within a period of about two years. Plaintiff was denied a recovery on the ground that the anticipated profits were too remote and speculative. Upon the question of the right to recover damages for anticipated profits the court laid down the following rule :

"The general rule is that the anticipated profits of a commercial business are too remote, speculative, and dependent upon changing circumstances to war-

rant a judgment for their loss. There is an exception to this rule, that the loss of profits from the interruption of an established business may be recovered where the plaintiff makes it reasonably certain by competent proof what the amount of his actual loss was.''

In *The Howe Machine Co. v. Bryson*, 44 Iowa, 159, 24 Am. Rep. 735, defendant was not permitted to recover damages claimed on a breach of contract, being the failure of plaintiff to supply defendant with sewing-machines to sell. The damages claimed were the anticipated profits that defendant contended he could have made on commissions from anticipated sales of sewing-machines within a limited territory. These were considered too remote, contingent, and speculative.

It is not claimed that the company prohibited plaintiff from selling watches to the employees of defendant, but only that it refused to protect upon its books, and collect, after January 1, 1900, orders of the employees given to plaintiff in payment for watches sold. Plaintiff had no guaranty from the company that he could sell 4800 watches, or any number of watches, to its employees. The employees had not been required to purchase this model, or design, of watch. Any watch which would meet the required standard of the time service was sufficient. Plaintiff had no assurance that he would be able to sell these watches to the employees; he had no assurance that, if these watches should be sold to the employees, it would continue to be at a price at which he would derive a profit; nor had he assurance that there would be a collection of the orders given for watches sold. In the sale of these watches he might be required to meet in competition, along the thousands of miles of defendant's railroad, all the vendors of watches that would

meet the required standard. The watches he was offering for sale were of a fixed design, or model. It is a well-known fact that in all such mechanical productions new and improved models are frequently being placed upon the market. Plaintiff, in the sale of watches to the employees of defendant, might have to meet and compete with vendors of watches having the later improvements to be found in these newer models.

The greatest reason plaintiff could have to believe that he might be able to sell watches to the employees of the company was that his prices were reasonable and his terms easy; but he was given no assurance by defendant, or by its employees, nor had he assurance from any source, that competitors would not offer watches to the employees of defendant at a less price and on easier terms. He was not guaranteed the exclusive right to sell watches to the employees of defendant upon the order system ; nor was he guaranteed the right to sell watches to the employees of defendant through the local inspectors of defendant.

The profit which plaintiff might make was not only contingent upon the fact that his model might continue a salable one, but contingent upon the number of watches he might be able to sell ; and also contingent upon the price at which he might be able to sell them, and that he might be able to collect for the watches sold. The record discloses that under the last arrangement with defendant he had sold 726 watches in about two and one-half years. At that rate it would require more than fourteen years to dispose of the remaining 4074 watches ; but there are no means of foreseeing, with a reasonable degree of certainty, that he would ever be able to sell them, or that there would be a profit to him on those he might sell.

Plaintiff does not sue for losses already sustained, but for gain, or profit, prevented by defendant. The unquestioned rule of the law is that damages of this character must be capable of being established with a reasonable degree of certainty, must be the natural and proximate consequence of the breach, and be free from conjecture and speculation. This court is unqualifiedly committed to this rule. (*Gas Co. v. Glass Co., supra,* and *M. K. & T. Rly. Co. v. City of Fort Scott, supra.*)

In further support of this well-recognized rule see the following authorities: *Eckington &c. Ry. Co. v. McDevitt,* 191 U. S. 103, 24 Sup. Ct. 36, 48 L. Ed. 112; *E. W. Bliss Co. v. Buffalo Tin Can Co.,* 131 Fed. 51, 65 C. C. A. 289; *Lowry v. Tile, Mantel & Grate Ass'n,* 106 id. (C. C.) 38, 46; *Allis v. McLean,* 48 Mich. 428, 12 N. W. 640; *Griffin v. Colver,* 16 N. Y. 489, 69 Am. Dec. 718, and notes; *Jones v. Call,* 96 N. C. 337, 2 S. E. 647, 60 Am. Rep. 416; *Chicago City Ry. Co. v. Howison et al.,* 86 Ill. 215; *Masterton v. Village of Mount Vernon,* 58 N. Y. 391; *Bridges v. Lanham,* 14 Neb. 369, 15 N. W. 704, 45 Am. Rep. 121; *Cincinnati Gas Co. v. Western Siemens Co.,* 152 U. S. 200, 14 Sup. Ct. 523, 38 L. Ed. 411; *Freeman v. Clute,* 3 Barb. 424; *Todd v. Minneapolis & St. Louis Ry. Co.,* 39 Minn. 186, 39 N. W. 318; *Masterton v. The Mayor &c. of Brooklyn,* 7 Hill, 61, 42 Am. Dec. 38, and notes; *Gray v. Smith,* 83 Fed. 824, 28 C. C. A. 168; *Todd v. Keene,* 167 Mass. 157, 45 N. E. 81; *Bierbach v. The Goodyear Rubber Co.,* 54 Wis. 208, 11 N. W. 514, 41 Am. Rep. 19; *Howard v. Stillwell & Bierce Mfg. Co.,* 139 U. S. 199, 11 Sup. Ct. 500, 35 L. Ed. 147; 8 A. & E. Encycl. of L., 2d ed., 608, 618; 13 Cyc. 36, 57. Many others might be cited. We would not be understood as holding, or implying, that damages may not be recovered

on a breach of contract for loss of anticipated profits where, under the contract, the damages claimed would be the natural and proximate consequence of the breach, and such as might be rendered reasonably certain, and do not enter the domain of speculation.

While it is not always easy to draw the line between anticipated profits which are the legitimate elements of damages and those which are too remote, contingent, or uncertain, it is quite apparent that under the authorities cited plaintiff's claim for damages is entirely prospective. The profits claimed depend upon too many contingencies and are too uncertain to furnish a safe guide in fixing the amount of his damages. It carries with it too much of the element of speculation to be the subject of judicial determination.

For error of the court in instructing the jury on the measure of plaintiff's damages the judgment is reversed.

All the Justices concurring.

CUNNINGHAM, J., not sitting.